1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3    ASSIA BOUNDAOUI,                )  Docket No. 17 C 4782
                                     )
4                   Plaintiff,       )  Chicago, Illinois
                                     )  September 6, 2017
5             v.                     )  8:57 a.m.
                                     )
6    FEDERAL BUREAU OF INVESTIGATION )
     and UNITED STATES DEPARTMENT OF )
7    JUSTICE,                        )
                                     )
8                   Defendants.      )

9
            TRANSCRIPT OF PROCEEDINGS - Telephone Status
10        BEFORE THE HONORABLE THOMAS M. DURKIN

11
     APPEARANCES:
12

13   For the Plaintiff:    MS. ALEXA POLETTO
                           Sidley Austin LLP
14                         787 Seventh Avenue
                           New York, NY 10019
15

16   For the Defendants:   MS. MARCIA K. SOWLES
                           MR. RYAN B. PARKER
17                         United States Department of Justice
                           Civil Division, Federal Programs Branch
18                         20 Massachusetts Avenue, N.W.
                           Washington, D.C. 20530
19

20   Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
                           Official Court Reporter
21                         219 S. Dearborn Street, Room 1432
                           Chicago, IL 60604
22                         312.435.6053
                           laura_renke@ilnd.uscourts.gov
23

24

25

1  (In open court.)

2  (Clerk places telephone call.)

3  THE CLERK:  Good morning, everyone.  This is Sandy

4  with Judge Durkin.  And this is Case 17 C 4782, Boundaoui v.

5  FBI.

6  THE COURT:  All right.  Good morning.  Let's have

7  everyone identify themselves for the record starting first with

8  plaintiff's counsel.

9  MS. POLETTO:  Good morning, your Honor.  This is Alexa

10  Poletto for the plaintiff.

11  MS. SOWLES:  This is Marcia Sowles from the Department

12  of Justice for the defendants.  And I have Ryan Parker also on

13  in my office.  He is the one that represented us at the first

14  status conference.

15  THE COURT:  All right.  Very good.  Thank you.  Thank

16  you all for being on the call.

17  Ms. Sowles, I had asked your colleague to relate to

18  you some of our discussions from the last status and then speak

19  to Ms. Poletto and see if there was any way you could reach any

20  agreement going forward about some of the things she was

21  requesting.  Have you had such a discussion?

22  MS. SOWLES:  Yes, we did.  We had a discussion on

23  Tuesday.  And because of my situation and also Alexa was out of

24  the country, we, you know, had it on Tuesday.  We went through

25  the various issues.  And we, you know, again made suggestion

1    and tried to explain, you know, what the FBI can do and can't

2    do.  And we were not able to reach any agreement.

3          However, the FBI did -- initially they said that we

4    would make our first production on having reviewed 500 pages

5    and processed them by November 1st.  The FBI, after considering

6    it, did say that they could move that up to October 15th.  So

7    we did that.

8          And I can go through the various issues and sort of

9    explain where the FBI is and what accommodations, you know, we

10   have tried to offer and what attempts we have tried to make

11   that -- we feel in this case that -- you know, we -- the FBI on

12   some of the things, like the index and stuff, we aren't

13   required to do.  We tried to see whether it was feasible, and

14   it wasn't feasible.  But I can go through each of those and

15   explain that.

16               THE COURT:  Go ahead.

17               MS. SOWLES:  Okay.  First of all, with regard to

18   the -- I guess the expedited processing, in this case, the

19   statutory provision for expedited processing just really gets

20   you to the head of the line.  And in this case, their request

21   is there that we are beginning to process.

22          The real issue is the rate of processing.  And the

23   rate of processing is what the -- and what we've done in -- you

24   know, in other cases and the one that -- the standard FBI uses

25   is reviewing 500 pages and processing them on a monthly basis

1    and doing it on a rolling basis.

2           And that is based on the fact that the FBI receives,

3    you know, thousands of requests.  In the fiscal year 2016, it

4    had 15,000 requests.  In the year -- fiscal year 2017, it has

5    27,000 requests.  I mean, that's almost, you know, double.

6           And that -- each of these requesters, just like the

7    plaintiff, you know, feel that their request is important.  And

8    the FBI tries to treat them equitably by, you know, reviewing

9    and processing 500 pages a month.  They find that that rate,

10   you know, gives each of the requests -- you know, gives the

11   requesters a -- you know, we review -- we help more requesters

12   that way and review, you know, more documents that way.

13          Also, they have found that the 500 pages per month

14   is -- you know, is reasonable based on essentially the large

15   requests, which -- and the complicated requests that are

16   involved, you know, many documents, because those are often

17   more complicated because they involve you -- in processing

18   them, you have to consult with other components of the FBI

19   because there may be things or sensitivities that aren't just

20   apparent from it or with other agencies.

21          And also, in cases like this where many of the

22   documents are classified, they have to go again under another

23   level of review, not just reviewing by the -- for the standard

24   exemptions but also be reviewed for declassification.  And

25   that's a whole separate unit that --

1      THE COURT:  Ms. Sowles, out of the -- excuse me one

2   second.  Out of the 27,000 FOIA requests you got in 2017, how

3   many people have actually gone to federal court to sue to have

4   a more speedy response to the FOIA request?

5      MR. PARKER:  This is Ryan Parker, your Honor.

6      My understanding from talking to the FBI is that this

7   year so far, they have at this point over 250 cases in

8   litigation, which is a significant increase from the amount of

9   litigation they've had in the past.  And so not only are they

10   processing, you know, over now at this point 27,000 FOIA

11   requests, they're in the process of litigating over 250 FOIA

12   cases in federal court.

13      And so it's a significant burden on the agency.  And

14   they have, as you know, finite resources, and they're doing the

15   best they can to equitably allocate those resources both in

16   regard to the FOIA requests and the litigation that they're

17   involved in.

18      THE COURT:  Okay.  None of you are here, but I have a

19   courtroom full of attorneys, and this is going to probably take

20   more time than I want to keep 30 or 40 attorneys waiting.

21      Can we pick up this call again at, say, 10:00 --

22   that's about an hour from now -- 10:00 Chicago time, or is that

23   going to be impossible?

24      MS. SOWLES:  That would be --

25      MS. POLETTO:  That's fine.  That's fine for me, your

Honor.

THE COURT:  Does that work for the attorneys from the government?

MS. SOWLES:  Yes.

THE COURT:  Okay.  Because I want to spend the time that needs to be spent on this.  But I think it's going to take a little longer than I had originally thought.

Can they use the same number, Sandy?

THE CLERK:  Yes, they can call in at 10:00 on the AT&T number.

THE COURT:  All right.  Why don't you all call back at 10:00, and we'll continue the discussion right where we left off.

MS. SOWLES:  Thank you, your Honor.

THE COURT:  All right.  Thank you all.

MS. POLETTO:  Thank you, your Honor.

THE COURT:  Okay.

(The Court attends to other matters.)

(Clerk places telephone call.)

THE CLERK:  Good morning, everyone.  This is Sandy with Judge Durkin.  And this is 17 C 4782, Boundaoui v. FBI.

THE COURT:  All right.  Good morning again.  Let's again have everyone identify themselves for the record starting first with plaintiff's counsel.

MS. POLETTO:  Good morning, your Honor.  This is Alexa

1    Poletto for Assia Boundaoui, the plaintiff.

2         MS. SOWLES:  This is Marcia Sowles for the defendants,

3    and I'm here with Ryan Parker also, from the Department of

4    Justice.

5         THE COURT:  All right.  Thank you for agreeing to come

6    back on this.  I had a number of other people in the courtroom,

7    and we've disposed of all those cases.  So we have no one else

8    in the courtroom.

9         And, Ms. Sowles, you were speaking last time, or your

10   colleague was, about 250 cases in litigation.  Why don't you

11   pick it up from there.

12        MS. SOWLES:  Okay.  As we explained, there are these

13   other cases in litigation.  And the 500 pages we're processing

14   and -- for review and processing is a figure that has been

15   upheld by both the district court here in D.C. and also by the

16   Southern District of New York where -- actually, those are

17   probably the two places where we have the most, you know, FOIA

18   cases and where they're requested.

19        And as -- and, again, so that if -- any deviation from

20   that would -- you know, could have a ripple effect because, you

21   know, that's the sort of the current standard.  So other, you

22   know, requesters could, you know, try to change that.  And,

23   again, that is the rate that's been upheld and we feel is fair

24   and as the D.C. courts and the Southern District have used.

25        And with regard to these other cases, I mean, they're

1    coming in all the time.  And just with the -- you know, like,

2    for instance, in the Comey firing, there was, you know, some

3    new cases on that.  We have a whole -- I think there's

4    currently 11 cases, litigation cases, involving, you know, the

5    Russian situation and -- you know, the alleged Russian

6    collusion and the FBI, you know, investigation of that.

7         So -- and again, you know -- you know, that -- you

8    know, each of these cases, you know, everybody feels that their

9    particular case is important.  And we are trying to deal with

10   them on an equitable basis, and that's the standard.  And also

11   it's a standard that really, considering the complexity of this

12   and the classification review, we find is fair.

13        The other sort of related question to that was the

14   question with regard to the indexing.  And, again, as we

15   pointed out in our status report, there's no obligation under

16   FOIA to create a document that -- we don't have an index, and

17   there's no obligation to create it.

18        Nonetheless, you know, the FBI, in an effort to sort

19   of bend over backwards and try to cooperate, we did explore

20   whether this was possible in this case.

21        And we determined that it was not feasible really

22   because many of the files or the subfiles contain the name of

23   an individual, and therefore it would be subject to privacy

24   exemptions under Exemption 6 and 7(C).  And, therefore, it

25   really wouldn't be that helpful because that you -- you know,

1    majority of the files would be exempt and that, in addition,

2    some of the documents could also be exempt because of other

3    sensitivities involved.

4            Moreover, trying to create this index and -- you know,

5    and then redacting it by, you know, going through and having to

6    process it, we would be, you know, diverting resources that

7    could be used to help process, you know, this case and others.

8    So for those two reasons did not.

9            However, we have, you know, developed, you know, this

10   plan of, you know, providing the -- you know, processing the

11   general files for Volumes 1 through 5 and 5(a).  Once those are

12   completed, then she -- the plaintiff will have not only those,

13   but she'll have the general files for -- that were released in

14   the -- the documents from the general files that were released

15   in the prior request for the other volumes that were available.

16           And that in looking at those, each of those when

17   they're released, they're released by -- there's a referral to

18   the section or the volume that they came from.  And, therefore,

19   the plaintiff in reviewing those documents could determine, you

20   know, "Well, those, you know, documents from Section 9 or

21   Section 5 are particularly helpful.  I'm particularly

22   interested in those."

23           And then the FBI could determine, you know, whether

24   there's any subfiles related to those.  And, if so, you could

25   have -- you know, the plaintiff could create a priority list

1   based on her review of the sections and those sections that she

2   thinks are most important or helpful for her project.

3          Second, and related to that, the plaintiffs also have

4   another tool to help, you know, prioritize, and that is that

5   the plaintiff's counsel keeps mentioning that "Well, some of

6   the names, you know, we could get privacy waivers."

7          Well, we haven't received any privacy waivers, and

8   that -- in order to, you know, do that, that's, you know,

9   something that's -- you know, the ball is in her court to do

10  that.  And, again, that's something that when she submitted the

11  initial request, if there were particular individuals that she

12  thought were willing to submit privacy waivers, you know, she

13  could have done that.

14         But we -- you know, the ball is in her court on that.

15  We haven't received it.  And that's, again, another way to

16  prioritize.  But, you know, the FBI is going to have to receive

17  those soon.  I mean, this can't be a case -- because, you know,

18  as we're processing it, if we receive one, you know, in

19  November, you know, we would -- that would mean -- you know, we

20  couldn't really reprocess the documents we've already started

21  to process.

22         So it's, you know, again, the ball is in her court on

23  that and that she has tools to -- you know, to help prioritize

24  by, you know, looking through these various sections.

25         The other question that you had was with the

1    declination memo.  Again, we aren't sure that one exists, but

2    the FBI, again, trying to bend -- and, you know, we're not

3    under -- you know, normally on a FOIA request, it's sort of

4    search out for a particular, you know, document, you know, as

5    we process it.  But we, nonetheless, you know, made an attempt

6    to do that by looking at the -- not sure one exists, but we

7    looked at the last volume to see whether or not, you know, it

8    was there.  And we could not find one.

9         And that the only other way we could -- and then they

10   also made an effort.  They thought, well, maybe there's a way

11   we could do it electronically.  Is there a way to

12   electronically search for this?  But so that -- and to do that,

13   however, they had to put in names of -- that, you know, seemed

14   to be popping up in the investigation.  And when they did that,

15   those -- there were just so many documents that it really

16   wasn't feasible under that basis.

17        And that in any case, that this declination memo, if

18   it does exist, would have been a document that would have been

19   created by, you know, the U.S. Attorney's Office or, you know,

20   the Criminal Division and that -- and, therefore, even if we

21   had it in our files, we would have to refer it to that office

22   for review and release.

23        And that, you know, if she's, you know, that

24   interested in the declination memo, then maybe her best, you

25   know, remedy for that would be to file a FOIA request to the

1    U.S. Attorney's Office.  But, you know, she hasn't done that.

2              Again, the other thing that we -- again, you know,

3    we're bending over backwards it seems.  We've asked the

4    plaintiff counsel that -- you know, because we don't know

5    whether one exists, that she seems to think that one exists,

6    and she has, you know, the documents that have already been

7    released in the prior request.  And if there is something in

8    there that indicates or suggests that there's a declination

9    memo, we've asked her to identify that document because perhaps

10   then, you know, that would help us, you know, locate it.

11             And, again, we haven't received anything on that.  I

12   mean, it seems like, you know, it's been a sort of one-way

13   street on our cooperation.

14             So, again, we haven't been able -- we don't know

15   whether one exists.  We haven't been able to find it.  We

16   looked the logical, you know, place in the last volume.

17             We haven't been able to come up with a method to do

18   it, and that would mean that we would basically be having to go

19   through the entire -- you know, all the pages to try to find

20   it.  And, again, that's only diverting resources from

21   processing, you know, the documents in this case and processing

22   other cases.

23             And, again, it's a document that the FBI really

24   doesn't own and would have to be referred to the

25   U.S. Attorney's Office.

1      THE COURT:  All right.  Well -- go ahead.

2      MS. POLETTO:  Your Honor, if I may.

3      THE COURT:  Ms. Poletto, before you start, I have a

4  couple questions of --

5      MS. SOWLES:  Sure.

6      THE COURT:  -- the DOJ attorney.  Then I'll give you

7  full chance to respond.

8      Ms. Sowles, are all the documents in Chicago, the FBI

9  files?

10     MS. SOWLES:  They've now been sent to the processing

11  unit, which is in Winchester, you know, in the D.C. area, yeah,

12  here.

13     THE COURT:  Okay.  So --

14     MS. SOWLES:  That's where those -- the FOIA office is

15  processing.  They have the documents.

16     THE COURT:  All right.  That was my question.  I

17  didn't know if there was a local agent or people working for

18  the bureau in Chicago looking at files in the Chicago field

19  office.

20     MS. SOWLES:  Well --

21     THE COURT:  Apparently not.

22     MS. SOWLES:  Okay.  Well, what I can say is that in

23  reviewing the documents, that because -- it is sort of a

24  cooperation.  So as the processing people here review it, they

25  do consult with the Chicago office.  So they're -- you know,

1  they're, you know, sort of simultaneously.  They're involved in

2  the processing unit because they're the ones that involved --

3  that were, you know, involved in the investigation.

4         THE COURT:  So the case agents are still with the

5  bureau, or at least someone is with knowledge of the -- of the

6  investigation?

7         MS. SOWLES:  I don't know whether the particular

8  people that did the investigation are.  But there are people

9  that -- in Chicago that they have -- how -- whether they were

10 involved in the original case or not or whether they were just

11 involved because they're familiar with how files are

12 maintained, I can't answer that.

13        THE COURT:  All right.  And how many documents are we

14 talking about if the entirety of the FOIA requests were

15 responded to and --

16        MS. SOWLES:  There's -- there's -- well, I don't know

17 the number of documents, but we're talking about 33,000 pages.

18        THE COURT:  All right.  And that 33,000 pages have now

19 been sent to a location in the D.C. area.

20        MS. SOWLES:  That's correct.  And that -- I think, you

21 know --

22        MS. POLETTO:  That's actually not correct -- right? --

23 because half of them are missing.

24        MS. SOWLES:  No, the 33,000 is what they have.  They

25 aren't sure how many are in, you know, the other supposedly

1   missing files.

2           THE COURT:  In the what?

3           Oh, missing files.  Okay.

4           MS. SOWLES:  Yeah, because we don't have those, so we

5   don't know how many pages are in them.

6           THE COURT:  All right.  And then my other question is

7   the declination memo.  Do you make inquiry of the

8   U.S. Attorney's Office to see if they had prepared one and sent

9   it to the FBI?  My experience was that the FBI typically didn't

10  have declination memos.  They remained in the U.S. Attorney's

11  Office.  But what is --

12          MS. SOWLES:  That --

13          THE COURT:  -- your experience?  Does the FBI

14  typically get copies of declination memos?  Because they're

15  prepared by the U.S. Attorney's Office.

16          MS. SOWLES:  That's exactly right.  And, your Honor,

17  we didn't inquire because that's again, you know, something

18  that on FOIA you don't have to -- you know, you're responsible

19  for the documents you have.  You don't have to go out and sort

20  of search out other documents.

21          But you're exactly right.  The FBI did say that, you

22  know, in most cases they do not get copies and that -- you

23  know, that -- you know, yeah, that that's the practice.

24          THE COURT:  All right.  And then they -- but you

25  looked at the -- basically the last file, which --

1        MS. SOWLES:  Right.

2        THE COURT:  -- typically, logically, would contain a

3    declination memo --

4        MS. SOWLES:  Right.

5        THE COURT:  -- if there was one.  And -- and your

6    representation is that there is no declination memo, at least

7    contained in the last file packet, which would be the logical

8    place where one would be contained.

9        MS. SOWLES:  Right.  That's what the FBI, the people

10   that are processing it -- they were the ones that looked at

11   that.  But that's correct, your Honor.

12       MS. POLETTO:  Ms. Sowles, may I ask for clarification?

13       Or, your Honor, can I ask for clarification on that

14   point?

15       THE COURT:  I have one more question.  Then you can go

16   back on each one of these.

17       MS. POLETTO:  Sorry.

18       THE COURT:  Let me just ask my last question.

19       My experience with FBI files, at least when I was a

20   prosecutor, was that the -- there were indexes in the front of

21   every file which listed out the 302s, the surveillance reports,

22   the, you know, catalogs of documents.  They'd contain envelopes

23   which would contain, you know, bank records or particular discs

24   of bank records.  My experience was that each one of these

25   files would have a -- you'd have multiple sets of files, but

1    there'd be an index at the front of each one of those.

2            Now, that's dated.  That's 25, 30 years ago.  Is that

3    still how they are maintained?

4            MS. SOWLES:  Well, your Honor, since the files are

5    in -- you know, they're processed -- I haven't seen those, and

6    I'm -- I'm not familiar with that index.  So I -- I -- you

7    know, I'm not sure -- you know, that's -- you know, I can only

8    speak from what I know.  And I haven't seen any.  You know,

9    they said that that index doesn't exist.

10           Now the -- so, you know, I mean, that's all I can say.

11           THE COURT:  Well, the index would contain names.  It

12   would be 302 of John Smith, 302 of Jim Jones, you know, bank

13   records obtained from Continental Bank.  You know, it would say

14   what's in there.

15           But it would also identify people who had been

16   interviewed if they were subjects of an interview and that they

17   were notes taken in a -- a summary prepared in a 302, though

18   I -- you're not familiar if that's still the way -- if that's

19   the way these are organized?

20           MS. SOWLES:  No, your Honor, I'm not.

21           THE COURT:  Okay.

22           MS. SOWLES:  I --

23           THE COURT:  All right.  Ms. Poletto, you had

24   questions, and then I'll let you respond to the arguments made

25   by defense counsel.

1          MS. POLETTO:  Thank you, your Honor.  I had one

2     question for clarification, and then I would like to respond.

3     Thank you.

4          Ms. Sowles, you had mentioned that the -- the FBI had

5     looked for the declination memo in the last file.  Just so I

6     understand, for my notes, was that the last file ever created

7     in the series of 19 volumes?  Is that what you're representing?

8     That's not what I understood from our conversation.  That's

9     fine.  I just want to make sure my notes are correct.

10         MS. SOWLES:  It was the one that they -- yeah, that

11    they considered the last file, yeah.  Yeah.

12         MS. POLETTO:  So they have a -- they have a sequence?

13    They can understand the sequence of the file?  Because you told

14    me on the phone yesterday they didn't know the dates of the

15    files.  I'm just a little confused.

16         MS. SOWLES:  What I told you is that there was not --

17    you know, that there wasn't any kind of, you know, like, this

18    is the beginning and this is -- you know, this starts from this

19    date, from that.

20         What I can represent is that the piece -- the FBI has

21    told me that they looked in what they think is the last --

22    would be the last file.  And that would be the file most likely

23    to contain it, yeah.

24         THE COURT:  And, Ms. Poletto, on that score, I'm not

25    sure what authority you'd have to get a memo prepared by the

1    U.S. Attorney's Office declining prosecution, whether it's in

2    the FBI possession or the U.S. Attorney possession.  But it's

3    more likely to be in the U.S. Attorney's possession.

4            MS. POLETTO:  Yes.  And I completely agree with you,

5    your Honor.  Sorry.

6            THE COURT:  And when do you -- why do you think there

7    would be a declination memo?

8            MS. POLETTO:  This is on information and belief, your

9    Honor, of my client.  And, you know, I -- it's her -- her

10   interest in understanding if the government knows if one has

11   been produced or not.

12           And I think it's something -- to be perfectly honest,

13   I think that's the least of her ask.  And if we have to submit

14   a FOIA request with the FBI -- with the U.S. Attorney's Office,

15   I -- I can consult with my client, but I think she'd be happy

16   to do so.

17           THE COURT:  All right.  Because I think the FBI, at

18   least on searching for an isolated document that wasn't even

19   prepared by them, has probably done as much as they can absent,

20   you know, just turning over 500 pages a month.  We'll get to

21   that in a minute.  But on the --

22           MS. POLETTO:  Yes.  And I think that's reasonable,

23   your Honor.

24           THE COURT:  Okay.  So I think from your end, on the

25   DOJ side, I think you've done all you can on the declination

1    memo.

2         And, Ms. Poletto, I can tell you sometimes they don't

3    even exist in the sense that not every investigation is closed

4    out with a declination memo.  Sometimes the FBI simply tells

5    the government there's nothing there, and the prosecution,

6    depending on the level of the assistant involved, will just

7    simply say, "Case over," and there will be nothing to

8    memorialize that.

9         It's not nearly as formal as I think anyone who is not

10   in that position would think.  Occasionally they do exist.

11   Often they exist, but not always.

12        But you'll have a better shot of -- if it's the

13   existence of one that you're looking for, you'll have a better

14   shot of learning that from a targeted FOIA request to the

15   U.S. Attorney's Office in Chicago if they were the prosecutors'

16   office involved in this investigation.

17        MS. POLETTO:  I understand, your Honor.  And that

18   question also was much more to the understanding what order the

19   files were in, which I had perhaps a misunderstanding in our

20   call yesterday.  So --

21        THE COURT:  Okay.  Now, go ahead --

22        MS. POLETTO:  So --

23        THE COURT:  -- with the other responses.

24        MS. POLETTO:  Thank you, your Honor.

25        I think it's important for me to provide a little

1    perspective here, your Honor.  One year ago my client, who is a

2    journalist, submitted this FOIA request to the government --

3              THE COURT:  Ms. Poletto --

4              MS. POLETTO:  -- I do believe for information -- yes?

5              THE COURT:  I don't want to -- because you're on the

6    phone, it's a little hard to hear you, and you need to slow

7    down a little.  I think it'll be --

8              MS. POLETTO:  I'm sorry.

9              THE COURT:  -- little bit better record for my court

10   reporter, and it will be easier for me to understand what

11   you're saying because -- you may have heard this before -- you

12   talk pretty fast.  So --

13             MS. POLETTO:  I apologize, your Honor.

14             THE COURT:  So slow down.  We'll have a better record

15   then.  Go ahead.

16             MS. POLETTO:  Thank you.

17             I'd like to provide a little perspective here, your

18   Honor.  My client one year ago submitted a FOIA request -- my

19   client, who is a journalist -- and arguably asking for

20   information which is very much in the public interest.

21             And this -- as you know, this information -- this

22   request was denied by the government.  And she was told to

23   reach out to the government to modify that request.

24             She did that, and the government never responded to

25   her.  So she retained counsel.

1          In an effort not to waste the government's time and

2     your Honor's time, I spent time communicating with the FBI,

3     trying to figure out a way how to get these documents,

4     extensive communication with the FBI.

5          And they ostensibly told me the same thing that they

6     have been saying, which is "No, you cannot get these documents

7     produced more quickly.  You will have to wait three years.  Or

8     the option is to withdraw all of your requests for all of the

9     volumes, save for three volumes, about a thousand documents,

10    and" -- sorry -- "thousand pages, and then we'll process those,

11    and then you can resubmit all of your requests again."

12         You know, obviously, in the eyes of my client, that's

13    not really an option.  She has a documentary coming out in

14    2018, and arguably this information is very much within the

15    interest of the community, the community that was affected

16    decades ago, and in the interest of national security.

17         And just so you're aware, she's also due to produce --

18    to give a cut to Sundance Film Festival on October 15th of this

19    year.

20         Now, we proceeded to litigation on this basis.

21    June -- the end of June, we filed this lawsuit.  The government

22    did not respond in time.  And I understand there are reasons,

23    that people have emergencies.  And we were fair.  We granted

24    them that request.  And a few weeks later, they submitted their

25    answers.  But that meant that the status conference was kicked.

1          My client and I flew out from New York to come to that

2    status conference.  And there were members of the community

3    that were affected decades ago in your courtroom ten days ago.

4    And it's fine.  Again, the status conference had to be delayed

5    because, again, I understand there are emergencies.

6          Now, why am I telling you this?  Because one year

7    later, we don't have one document in hand (A).  (B) This is not

8    a run-of-the-mill FOIA request.  This is a FOIA request that,

9    you know, is very much within the public interest, and it is

10   timely.  She has a documentary coming out in 2018.  She has a

11   cut due to film -- Sundance Film Festival October 15th.

12         And also the fact that the government characterizes

13   themselves as bending over backwards, I find very hard to take

14   that position when you look at the facts on the record.

15         To the contrary, I would argue that there seems to

16   be -- one can't help but query if there has been a process of

17   delay, the tactic of delays here, because we are one year later

18   and we don't have a document in hand.

19         Now, the government is saying that we are now at the

20   front of the line and we've had our request -- basically, we've

21   now been expedited.

22         That's not true.  My client is really not in a better

23   position than she was a year ago because the government is

24   saying, "We'll process" -- not produce, your Honor -- "We will

25   process these documents at the rate of 500 pages a month."

1    Now, that means my client might get one document.  She might

2    get 500, but she might get one document.

3            And not only -- they tell us they started producing

4    these on August 15th.  And then we're told -- and we thought,

5    all right.  At least we're going to get -- we don't think 500 a

6    month is enough, but at least they're going to get started.

7            And then we're told, "Oh, but hold on.  You're not

8    going to get them until November 1st," which is 12 weeks later.

9    It's not even a month later.  It's 12 weeks later, which is

10   almost three months.

11           And then when they come back and say, well, they're

12   bending over backwards by offering these documents on

13   October 15th, two months later than when they started,

14   August 15th, again, I don't think it's fair to characterize

15   that as bending over backwards.

16           Now, you know, we -- our original requests, for these

17   documents to produce -- to be produced, all of them, the 1,000

18   whatever, the files 1 through 5a to be produced immediately and

19   750 pages produced, not reviewed, on a monthly basis.

20           For the government to say that is entirely

21   unreasonable is just a -- or that it's not done -- to say that

22   it's not done is also an untruth, your Honor, because I can

23   point to case law -- and I will provide the case law -- where

24   the government has been compelled to produce -- not review,

25   produce -- thousands of pages per week.

1    And I think it's very reasonable for my client at this

2  point to expect more than 500 documents a month to be reviewed,

3  especially when the government is saying that they won't even

4  be reviewed until October 15th.

5    And so, you know, I -- today my real interest is

6  having the government compelled to a schedule to produce

7  documents.  And we can discuss the index because I also

8  disagree about their representation of the index, and I'm happy

9  to go into that first.

10    But I really think that it's time now that we talk

11 about getting documents produced on a timely -- not just

12 reviewed, but produced -- on a reasonable and timely basis.

13    And I would like to add one more thing.  And I'm sorry

14 if I'm speaking quickly.  I'm trying to slow down.

15    But these documents have not been sitting around, your

16 Honor, and on a dusty shelf.  I would just like to make that

17 clear because I don't expect you to understand the history of

18 this case.  But these documents -- many of these documents were

19 used in litigation in 2006.  There -- I have -- I have evidence

20 from my client that FBI offices from all over the country were

21 communicating with the Chicago field office, asking for copies

22 of these documents.

23    And I'm saying this because, you know, these documents

24 have been processed for production and review either by members

25 of the public, like the gentleman who made his request in

1    2012 -- sorry -- yeah, 2012 -- or this litigation that happened
2    in 2006.
3                  And so I'm -- I -- I do appreciate -- I really do
4    appreciate the government has a lot on their plate, and for
5    that reason I have -- we've tried to speak with the government,
6    to enter in discussions with the government.  I have understood
7    when there have been delays.
8                  But I also think that we do need to be met halfway
9    here, and the FOIA is a way for people of the public to get
10   information on a timely basis.  And my client qualifies for an
11   expedited basis, I believe.  And even if she didn't qualify, I
12   think that the rate at which the government has been handling
13   this request is unacceptable.
14                 THE COURT:  When is your --
15                 MS. POLETTO:  And I'm happy to go on to the other
16   point.
17                 THE COURT:  Well, let me just ask a couple questions
18   first.  Are the D.C. Circuit and the Southern District cases
19   the 500 pages -- is that 500 pages reviewed or 500 pages
20   produced?
21                 MS. SOWLES:  It's 500 pages reviewed and processed.
22   It would be almost impossible to have 500 pages produced
23   because you could have all the documents exempt, I mean, you
24   know, because, you know, you -- to -- I mean, that would be an
25   almost impossible standard to meet because you might have to

1   review -- I mean, you don't know -- you know, so it's you

2   review 500 pages, and you produce whatever you can that's

3   non -- that's nonexempt.  That could be 500 pages; it could be

4   300 pages.

5        But to have the target as what you -- you know, that

6   you produce 500 pages when, you know, a lot of these are

7   classified or, you know, subject to other exemptions, I mean,

8   you know, that's -- that would be like an almost impossible

9   task because you'd be having to maybe review all 33,000, you

10  know, pages to get 500 pages.  I mean, it's so --

11       THE COURT:  I understand your point.

12       MS. SOWLES:  Yeah.

13       THE COURT:  I understand your point.

14       MS. SOWLES:  Yeah.

15       THE COURT:  Now, when was the FOIA request first made?

16       MS. POLETTO:  September 26, 2016.

17       THE COURT:  All right.  And without having read those

18  cases, the 500 pages of processing, when is that supposed to

19  begin upon when a FOIA request has been made?  Don't you

20  have -- you have a period of -- a statutory period before you

21  have to respond.  Is that correct?

22       MS. SOWLES:  Right.  And then in this case, though,

23  there -- you know, there's backlog and also because the -- you

24  know, the plaintiff, you know, didn't want -- you know, she was

25  unhappy with the 500 pages that, you know, we were attempting

1    to, you know, suggest that she narrow it.  So -- and then there

2    was a question also about, you know, payment and stuff, so

3    there were other problems but that, you know -- you know, but

4    she's now -- you know, we are processing it.

5         With regard to the issue about, you know, August that

6    we started processing or we submitted and we started --

7         THE COURT:  Now, Ms. Sowles, I'm sorry to interrupt

8    you.  But if a September 26, 2016, FOIA request is to be

9    made -- has been made, what is the statutory date?  I don't

10   have the statute in front of me, but I thought there's a period

11   of time --

12        MS. SOWLES:  It's 20 -- it's 20 business days unless

13   there's extraordinary circumstances.  And in this case, just

14   because of the sheer volume of the -- you know, the number of

15   requests, that it's almost -- you know, and the FBI, I mean,

16   that would be, like, a rare case that we would be able to do

17   it.  I mean, there's this backlog of cases.

18        THE COURT:  But my question is simpler.  You have

19   20 days to respond.  So shouldn't the processing have taken

20   place -- at least begun -- no later than early November of

21   2016?

22        MS. SOWLES:  Well, your Honor --

23        THE COURT:  I know you have a backlog, and I know

24   there's other issues.  But under the statute, shouldn't the

25   processing have started to take place by early November of

1     2016?

2            MR. PARKER:  Your Honor, this is Mr. Parker.  And if I

3     could speak to that question.

4            The statutory deadline is for the agency to respond to

5     the FOIA request.  It's not a requirement that they actually

6     produce the documents by that day or even that they start

7     producing.

8            And in situations where the agency reaches out to the

9     requester to try to, for example, narrow the request or to

10    resolve fee issues, that date can be extended.

11           A response to a FOIA request can be as simple as "We

12    are not going to process the request," or "We don't have

13    documents."

14           But I don't think that means that the agency has to

15    actually respond by that date.  I think what happens when a

16    FOIA request is received is there's a response.  There's an

17    attempt to resolve preliminary issues.  And then the requester

18    is put into the queue based on the type of request that it is.

19           And so what happened in this case is some preliminary

20    issues were addressed, and the request was put directly into --

21    into the line.  And the FBI processed the other requests that

22    were submitted first as quickly as they could.  And the

23    requester here has made it to the front of the line, and her

24    request is now being -- being processed.

25           But I don't think the statutory requirement is that

1   they actually have to return -- start providing documents on

2   that day.  It's that they provide a response to the request

3   that they will not provide documents or that they will -- that

4   they are planning to provide documents.  I don't think it

5   requires them to actually provide the documents beginning at

6   that time.

7          THE COURT:  Well, I'd have to read the statute.  And

8   if we have to brief it, we'll brief it.

9          Do you agree with Ms. Poletto, though, that there have

10  been cases where courts have ordered the processing -- and

11  taking Ms. Sowles' point that processing may result in a number

12  of documents being exempt.  But are you -- would you agree with

13  Ms. Poletto that there have been courts that have ordered

14  processing to occur on a more expedited basis than the

15  500 pages that at least the D.C. Circuit and the Southern

16  District courts have held?

17         MS. POLETTO:  Your Honor, I am happy to provide case

18  law where what courts have done is they have said that the

19  agency can either choose to review, for example, 4,000

20  documents on a biweekly basis -- I was just looking at this

21  case.  They have a choice: to review 4,000 documents on a

22  biweekly basis or produce 1,500 documents in that biweekly

23  basis.

24         So I understand that some of them might be redacted or

25  exempt.  But I think there's ways to work at this and so

1    documents are produced and not just -- you know, not simply --

2    there is case law that this happens on a much, much higher

3    volume, and you can get around the issue that -- yes.

4         I mean, we understand that a lot of these might be

5    redacted or exempt, but we just need them to start being

6    reviewed so we can see what we're getting back.  And I think it

7    needs to be done at a higher volume than 500 reviewed a month.

8    Otherwise, just like you're saying, we might get two documents

9    a month.

10        THE COURT:  What about the --

11        MS. SOWLES:  But I'm not aware of any cases that -- I

12   mean, she hasn't provided them, so I don't know what cases

13   she's talking about or what the circumstances were.

14        There are cases where, you know, because of maybe some

15   sort of, you know, emergency situation, but I -- and, again,

16   you know, as we said, the FBI, you know, currently has, you

17   know, the -- you know, the Russian, you know, investigation,

18   the, you know, James Comey, you know, other things that are,

19   you know, sort of, you know, headline news.  And --

20        THE COURT:  Well, headlines doesn't cut it for me --

21        MS. SOWLES:  Yes.

22        THE COURT:  -- as being more important than a request

23   from a citizen for --

24        MS. SOWLES:  Right.

25        THE COURT:  -- documents for whatever purpose.  She's

1    got her own purpose.  It's apparently to produce a documentary.

2    I'm not going to put that at a lower priority than a headline

3    case because she filed this last September, and she hasn't

4    gotten a document yet, as I understand it.

5            And I -- I think -- what about the -- Ms. Poletto,

6    what about these privacy waivers?  Do you have individuals who

7    you can give names to the FBI, saying these people would waive

8    any privacy concerns they have as to their names?

9            MS. POLETTO:  That is correct, your Honor.  My client

10   is from the community that was surveilled decades ago, and she

11   is currently on a campaign right now to collect all the

12   necessary privacy waivers.

13           Now, she did this because the government came back to

14   us and said they couldn't provide us where the majority of

15   documents are from because we don't have privacy waivers.  So

16   when the government says that we didn't produce them earlier,

17   it's because they only recently told us they would not give us

18   the subfiles because the subfiles would all be exempt.

19           For that reason, my client has moved back to Chicago

20   to obtain these privacy waivers.  Now, to that point, she's

21   happy to produce them as quickly as she can.

22           But yesterday on my call, the government informed me

23   they would not start producing any government -- any documents

24   until the privacy waivers were provided --

25           MS. SOWLES:  That's not true.

1       MS. POLETTO:  -- which I frank --

2       THE COURT:  Well, actually --

3       MS. POLETTO:  That is true.  You said if we --

4       THE COURT:  -- let me --

5       MS. POLETTO:  You said we --

6       THE COURT:  -- let me interrupt.  Whether that's true

7   or not, that's probably not an irrational request from the

8   government if they did it because if you have privacy waivers

9   and you have the complete list of people who are waiving their

10  right to privacy, that means it's a single review rather than

11  multiple reviews if I'm following how this process works.  That

12  doesn't seem --

13      MS. SOWLES:  That's correct --

14      THE COURT:  -- illogical to --

15      MS. SOWLES:  -- your Honor.  Yeah, that's why we

16  wanted them, you know, as soon as possible, I mean, so we

17  didn't have multiple reviews, you know.

18      THE COURT:  Because, Ms. Poletto, if --

19      MS. POLETTO:  Your Honor --

20      THE COURT:  -- you gave them a dozen names now, they

21  did their review, and then you gave them another dozen, you

22  know, in a month or two, they'd have to go back and rereview

23  what they did the first time, I think.

24      MS. POLETTO:  Right.  Now, my understanding, your

25  Honor, is that there are subfiles that relate to individuals,

1    specific individuals.  So if a privacy waiver for -- for

2    example, if I submitted -- if someone were to submit a privacy

3    waiver on my name, the government would have to find that

4    subfile under my name.

5              THE COURT:  Okay.

6              MS. SOWLES:  That's not quite true.  What it is, what

7    I tried to explain yesterday, is that in the general files,

8    there are names that are mentioned and that those are -- would,

9    you know, be redacted under Exemption 6 and 7(C).

10             However, if a privacy waiver is submitted, then those

11   names within that memo would be, you know, released.

12             MS. POLETTO:  You're talking about the main file,

13   though, right, Marcia?  Because my client is happy to take

14   whatever memo in the main file redacted.  That's fine.  If she

15   has to get those -- I mean, and obviously this is subject to

16   the Court's discretion.  But if she can get the main file

17   redacted, that's fine, and then just get subfiles for the

18   individuals whose names she -- privacy waivers she provides you

19   with.  She's okay with that.

20             MR. PARKER:  Just to make sure that we're not speaking

21   past each other, the exemptions are actually applied on a

22   document on a page-by-page basis.  So it isn't something where

23   if someone's name is on a subfile, if they submit a privacy

24   waiver, you would automatically receive the whole file.

25             As they go through the documents, they would redact

1    individual names based on privacy interests.  And if those

2    individuals have submitted privacy waivers, then that -- that

3    information would not have to be redacted either from the main

4    file or from the subfiles.

5            That doesn't mean that there wouldn't be other

6    information -- for example, law enforcement-related information

7    or classified information -- that would be redacted.

8            MS. SOWLES:  Or even names of other individuals in

9    that subfile.  So yeah.

10           MR. PARKER:  That's correct.

11           THE COURT:  All right.  Well, that --

12           MS. POLETTO:  I under -- sorry.

13           THE COURT:  That seems to militate in favor of your

14   client, Ms. Poletto, providing the list of people who are

15   waiving their privacy in a single filing as soon as she can do

16   that.

17           MS. SOWLES:  And we need the actual waivers, not just

18   a list, yeah.

19           THE COURT:  Well, I'm -- that's fine.

20           MS. SOWLES:  Yeah.

21           MS. POLETTO:  Okay.  If we submitted those, how

22   quickly can we get the documents processed then?

23           MS. SOWLES:  Again, it's 500 pages per month.  That's

24   our standard, yeah.

25           THE COURT:  All right.  Well, Ms. --

1          MS. POLETTO:  Your Honor --

2          THE COURT:  Hang on.

3          MS. POLETTO:  -- I don't understand --

4          THE COURT:  Ms. Sowles, I'm -- I don't think 500 pages

5     per month, absent a clear precedent preventing me from ordering

6     anything more than that, is going to be acceptable in this case

7     for a FOIA request that's been pending since September of last

8     year.

9          I -- I'm obviously not going to act lawlessly.  I'm

10    not going to order something that a binding precedent prevents

11    me from doing.  But on its face, I'm telling you right now I

12    think what's occurred is unacceptable.

13         And I'm happy to take briefing -- and it will be

14    prompt briefing -- on this issue, or I'm happy to let you

15    continue to discuss this offline in light of what we discussed

16    today to see if you can reach an acceptable compromise.

17         But I'm telling you at this point, absent something

18    telling me I can't do it, I'm going to order processing at a

19    faster rate than has occurred because we are nearly one year

20    after a FOIA request without document one being produced.  And

21    I find that unacceptable.

22         So I don't think we need to discuss this more unless

23    there's something anyone wants to add, other than I'll have you

24    back for another call next week and with a written status

25    report that you prepare because we can't spend this amount of

1    time.  I have a trial next week.  We won't be able to spend

2    this amount of time on this.  But I would like a written status

3    report about your efforts to compromise and your areas of

4    disagreement.

5           And then if -- you can each either refer to the

6    original status report or put an addendum on your joint status

7    report with your respective positions on what the law allows me

8    to order by way of processing at greater than 500 pages per

9    month.  That's how I see it right now.  And my hope is you can

10   come up to an acceptable compromise.

11          But the government should know what I just said about

12   my thoughts on the case at this moment.

13          So let's pick a day next week you can all participate

14   in a call.  We may do it a little bit early.  I have a jury

15   trial.  So we'll probably do it at 8:45 Chicago time just so --

16   late your time, so it shouldn't be a problem.  We'll give you a

17   date.

18          THE CLERK:  Let me look here.

19          How is the 13th?

20          MS. POLETTO:  That works fine for me, your Honor.

21          This is Alexa Poletto.

22          MS. SOWLES:  I'm looking at my schedule.

23          That would be okay, yeah.

24          THE COURT:  All right.  We'll do it at 8:45 on

25   September 13th.

1      I would like a written status report prepared and

2  presented by noon on the 12th.  And if there is -- you know,

3  I'm not looking for briefs, but you can put in in I'd say two

4  pages or less per side any authority you have on areas you

5  can't reach a compromise on that would support my ordering or

6  would not support my ordering a processing at greater than

7  500 pages per month.

8      You don't need to add to the cases that you did put in

9  your original status report.  I've read -- I read the status

10 report.  Frankly, I didn't read the cases, but I will once I

11 get your new status report.

12     Are there any questions?  First from the plaintiff.

13     MS. POLETTO:  No, your Honor.  There's no questions --

14     THE COURT:  How about on defense?  Anything from the

15 defense side?

16     MS. SOWLES:  No.  I mean, we gave our cases that we --

17 you know, some case samples of where she had 500, you know,

18 pages.  If Ms. Poletto could give us, you know, her case that

19 she thinks that, you know, there was this substantial rate, we

20 would appreciate that because, you know, our office handles a

21 lot of the FOIA requests, and we're certainly not aware of any

22 one -- that particular one.  But --

23     THE COURT:  All right.  Well, Ms. Poletto, you should

24 provide the case or cases you're referring to so that you can

25 both put it in the status report and they would have a fair

1   chance to respond and distinguish them if there's something to

2   distinguish it.

3           MS. POLETTO:  I will, your Honor.

4           THE COURT:  Okay.  Anything else we need to discuss?

5   Sorry to cut you off, but I kind of heard all I needed to hear

6   unless there's a new point someone needed to raise that we

7   haven't touched on already.

8           MS. SOWLES:  No, your Honor.  Thank you.

9           MS. POLETTO:  Thank you, your Honor.

10          THE COURT:  Okay.  Thank you all.

11      (Concluded at 10:41 a.m.)

12              C E R T I F I C A T E

13      I certify that the foregoing is a correct transcript of the

14  record of proceedings in the above-entitled matter.

15

16  /s/ LAURA R. RENKE                          September 29, 2017
    LAURA R. RENKE, CSR, RDR, CRR
17  Official Court Reporter

18

19

20

21

22

23

24

25