## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ASSIA BOUNDAOUI,                    )
                                    )
            Plaintiff,              )
                                    )        No. 17 C 4782
      v.                            )
                                    )
FEDERAL BUREAU OF INVESTIGATION AND )        Judge Thomas M. Durkin
UNITED STATES DEPARTMENT OF JUSTICE,)
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

Before the Court in this action under the Freedom of Information Act ("FOIA") are two show cause motions by plaintiff Assia Boundaoui ("Plaintiff") against defendants the Federal Bureau of Investigation and the United States Department of Justice (collectively, "Defendants") for failure to comply with this Court's orders. R. 99; R. 144. For the reasons that follow, those motions are largely denied.

## Background

Plaintiff is a journalist and documentary filmmaker who produced *The Feeling of Being Watched*, a 2018 documentary concerning FBI surveillance of Muslim Americans in the Chicago neighborhood of Bridgeport in the 1990s. In September 2016 and in connection with her work on the documentary, Plaintiff submitted a FOIA request to the FBI (the "FOIA Request"). The FOIA Request sought records of the anti-terrorism investigation "Operation Vulgar Betrayal" or "265-CG-101942" that began in 1995 and was closed in 2000 (the investigation hereinafter sometimes referred to as "OVB," and this portion of the FOIA request as, "Section One"). R. 101,

Ex. A. The FOIA Request also sought in relevant part "all files related to the intelligence investigation associated with Operation Vulgar Betrayal" ("Section Two"); and "all files related to the investigation that continued the work of 265-CG-101942 in the 2000's" ("Section Three"). *Id*. In addition, Plaintiff sought expedited processing of her request and a fee waiver. *Id*. The FBI informed Plaintiff that it would take over three years to process the approximately 33,120 pages of records it had located that were responsive to Plaintiff's FOIA Request, and denied her request for expedited processing and fee waiver. R. 101, Ex. B, C.

Plaintiff ultimately filed this case in June 2017, requesting that responsive records be processed at an expedited rate and seeking a waiver of applicable fees. R. 1. At a status conference that September, this Court directed the parties to meet and confer regarding a processing rate greater than the FBI's standard 500 pages per month. Unable to reach agreement, Plaintiff moved to compel expedited processing. R. 33. Defendants opposed, arguing among other things that their response should be limited to the OVB file as the only portion of the request that "reasonably describe[d] the records sought." R. 37 at 8-11. Thereafter, the Court granted Plaintiff's motion via a September 26, 2017 status hearing, R. 43, and minute order (such order, "September 2017 Order"), requiring Defendants to, in relevant part:

> (2) review the approximately 33,120 pages of documents already identified by defendants as responsive to plaintiff's FOIA request on a rolling basis of 3,500 pages per month . . . ; and (3) give priority to the sub-files of individuals for whom plaintiff provides privacy waivers by appropriate means on or before October 16, 2017.

R. 40. The September 2017 Order continued, indicating:

> To the extent plaintiff seeks to challenge the FBI's search identifying 33,120 pages of relevant documents involving the Operation Vulgar Betrayal criminal investigation and seeks review of documents beyond those identified documents, that issue . . . should be addressed in the context of a motion for summary judgment. The expedited processing need not include such documents. The parties should provide monthly written status reports reporting on the compliance with this order.

*Id.* Plaintiff thereafter provided Defendants with 179 privacy waivers for persons who resided in Bridgeview during the relevant time period and recalled heightened surveillance activity, unprompted house calls, and law enforcement interviews (the "Privacy Waivers").

Defendants processed the OVB documents at the required 3,500 pages per month rate through May 2018. Then in June, Defendants processed 2,962 pages and informed Plaintiff that: (1) but for documents that were the subject of consultations with other agencies, they had concluded processing OVB documents; and (2) they would not produce any documents related to any investigation that followed OVB because the FOIA Request did not reasonably describe those records. R. 55. The parties memorialized their disagreements in their monthly status reports and Defendants continued to process the remaining OVB documents at a fraction of the 3,500 per month rate until a May 2019 status conference at which the Court ordered Defendants to submit:

> an affidavit from an agent answering the question of whether or not there are files related to the investigation that continued the work of 265-CG-101942 in the 2000s.

R. 78 at 24 ("May 2019 Order"). The minute order issued that same day reiterated that by June 7, "an affidavit is to be submitted by a representative of the government that sets forth the requirements stated by this Court." R. 77.

On June 7, Defendants moved for partial summary judgment concerning whether they had met their obligation to search for records in response to the FOIA Request, and included as exhibits thereto declarations from Section Chief of the FBI's Record/Information Dissemination Section ("RIDS"), Information Management Division, David M. Hardy, and FBI Special Supervisory Agent Daniel R. William purporting to respond to the Court's May 2019 Order.[1] R. 79. Among other things, Mr. Hardy's declaration explained the search process RIDS uses generally and in this case, and Agent William's declaration explained that after its closing, OVB was not reopened, assigned a new case number, or consolidated with another investigation. R. 80, Exs. 1 and 2.

But dissatisfied with those declarations and Defendants' efforts with respect to Sections Two and Three of the FOIA Request more generally, Plaintiff moved for an order to show cause why Defendants should not be held in contempt for failure to comply with the Court's September 2017 and May 2019 Orders ("2019 show cause motion"), citing Defendants' alleged failure to: (1) continue to process documents at the 3,500 per month rate; (2) produce any documents concerning the persons for

---

[1] This represented the second such declaration offered by Mr. Hardy in this case, and the first such declaration offered by Agent William.

whom Plaintiff provided Privacy Waivers; and (3) adequately search for records concerning the investigation that followed OVB. R. 99; R. 100.

Defendants' summary judgment motion and the 2019 show cause motion were fully briefed last fall. But the Court declined to rule on either at the November 2019 status conference that followed, citing Defendants' failure to directly answer in the declarations submitted whether or not there were files related to the investigation that continued the work of OVB in the 2000s. R. 119 at 4-5 (citing R. 78 at 24). The Court ordered Defendants to submit by December 2:

> an affidavit indicating clearly whether there was any continuation of the work of Operation Vulgar Betrayal after that investigation was closed and whether there are any files related to any continuation of that work.

*Id.* at 5-6 ("November 2019 Order"). The Court commented that "if, in fact, that affidavit is specific and clears up that there was nothing . . . related to Operation Vulgar Betrayal that continued, then the production is likely complete. If not, it's not complete." *Id.* at 5-7.

Defendants subsequently submitted another declaration from Mr. Hardy, this time identifying and promising to process two files totaling approximately 41,250 pages (together, the "Salah file"). Mr. Hardy attested that the FBI had initially used the information provided within the "four corners" of the FOIA Request to search for responsive files consistent with FBI procedures and FOIA. R. 120, Ex. 1 ¶ 10. But based on the Court's remarks at the November 2019 status hearing that Defendants still had not answered "whether steps were taken to continue the work of [OBV] and, if so, whether any files exist on the subject," the FBI examined newspaper articles

5

("News Articles") and a federal indictment in which three individuals—Mousa Abu Marzook, Muhammad Salah, and Abdelhaleem Ashqar—were captioned (the "Salah Indictment"), each of which Plaintiff submitted with her opposition to Defendants' summary judgment motion. The FBI concluded that these documents suggested that "there was a continuation of the work . . . after September 11th, 2001," and that the News Articles "appear[ed] to point to matters that ultimately resulted in the [Salah Indictment]." *Id.* ¶¶ 5-6. Mr. Hardy explained that RIDS then used the captioned names as search terms in the FBI's Central Records System ("CRS"), because the Indictment—a publicly available court record—constituted an official DOJ acknowledgement of an investigation. *Id.* ¶¶ 5-7. This search located the underlying investigative files for the three captioned individuals as to the crimes discussed in the Indictment. And after reviewing certain information for those files, the FBI concluded that two of them—together, the Salah file—while not "continuations of the work of" OVB, "appear[ed] to share common subject matter with" OVB and/or the Salah Indictment (such investigations together, the "Salah investigation"). *Id.* ¶ 7.

Mr. Hardy indicated RIDS would scan and upload the "heavily classified" Salah file into the FBI's FOIA document processing system after "a classification review." The records would also require consultations with other agencies during processing, and each planned monthly release would undergo review by operational personnel. *Id.* ¶ 8. Finally, Mr. Hardy attested that the FBI's typical processing rate in similar cases—including regarding matters of high public interest—was 500 pages

per month, and indicated that the FBI intended to process the Salah file at that rate.[2] *Id.* ¶¶ 9-10.

At the December 17, 2019 status conference that followed, having determined that Defendants still had not directly answered the Court's question as to whether there was any investigation that continued the work of OVB, the Court ordered a hearing at which both Mr. Hardy and Agent William would be subject to questioning. R. 123.

At the January 2020 hearing, Mr. Hardy explained consistent with his earlier declarations that RIDS is responsible for both: (1) determining whether FOIA requests "reasonably describe" the records sought as required by DOJ regulations and related policies, using the language within the "four corners" of the relevant FOIA request; and (2) if so, conducting searches for those records in CRS. R. 128 at 9-10, 12, 14. He testified that criminal investigative files could be located in the index-based CRS using operational case names, file numbers, or the names of associated subjects, victims and/or events, *id.* at 10-11, and explained that each criminal investigation has its own administrative dashboard within CRS listing the number of parts of the investigation and subfiles, its opening and closing dates (and if later reopened, when), and the file number and name (including any changes thereto), *id.* at 25-26. Mr. Hardy explained that RIDS does not contact FBI agents to determine additional search terms or inquire about the existence of potentially responsive

---

[2] Defendants subsequently agreed to and have been processing the Salah file at a rate of 800 pages per month.

documents, because the Government is required only to respond to the request as written (not conduct research or otherwise move beyond its typical search process), and CRS is the "most reliable process we can use to identify files." *Id.* at 11, 22-24. According to Mr. Hardy, once identified on CRS, RIDS then locates the responsive documents, which for documents predating 2012 involves copying the physical files from the FBI office of origination because they are not stored electronically. *Id.* at 11-12. Next, the documents are "processed," which includes scanning, digitizing, and reviewing them for exemptions subject to redaction. *Id.* at 13. Finally, RIDS downloads the file and runs security checks before delivering to the requester. *Id.*

Mr. Hardy testified that in this case, RIDS determined that Section One of the FOIA Request, seeking "the main file and all sub-files for the criminal investigation codenamed Operation Vulgar Betrayal, 265-CG-101942, which began around 1995" reasonably described the records sought, because RIDS could use the code name and file number[3] as search terms in CRS, and that it did so separately and in combination to locate the OVB file. *Id.* at 16, 18. But according to Mr. Hardy, Section Two, seeking "All files related to the intelligence investigation associated with Operation Vulgar Betrayal," did not reasonably describe records sought because RIDS had already searched for "Vulgar Betrayal," and a search for the terms "intelligence investigation associated" was not feasible. *Id.* at 19. RIDS concluded that Section Three—seeking "[a]ll files related to the investigation that continued the work of 265-CG-101942 in

---

[3] Mr. Hardy explained that "265" referred to terrorism activities, "CG" referred to the Chicago office, and "101942" was a unique number assigned by CRS when the case was opened. *Id.* at 17.

the 2000's"—did not reasonably describe records for similar reasons, and that the CRS dashboard for OVB did not reflect any linkage to any other FBI investigation. *Id.* at 22, 26. But Mr. Hardy explained that rather than communicate to Plaintiff that Sections Two and Three of her FOIA Request could not be processed, RIDS "delayed the issue" to see whether it could find anything "within the [OVB] file[ ] itself that might provide a pointer." *Id.* at 23. RIDS ultimately did find reference in the OVB file to a money laundering investigation that was created to run parallel—and thus linked—to OVB ("Parallel Investigation"). *Id.* at 28-29. RIDS determined that this file was responsive to Section Two for that reason, and so it located, processed and produced the nonexempt portions of its 300 pages to Plaintiff along with OVB itself. *Id.* at 25, 29, 31. RIDS found no other information linking OVB to any other investigation in processing the OVB file. *Id.* at 30.

But consistent with his affidavit, Mr. Hardy testified that after the November 2019 hearing and order, RIDS conducted an additional search on Plaintiff's behalf using the names of the three captioned individuals on the Salah Indictment, *id.* at 33-34, and that while ordinarily, an additional submission following a FOIA request would be treated as a new and separate request, processed as such in due course, in this case RIDS began processing immediately in the hopes of resolving this lawsuit, *id.* at 34-35, 40-41. Ultimately, this additional search turned up the Salah file that RIDS is now processing despite that it was not administratively linked to OVB in CRS, and that RIDS does not consider it responsive to the FOIA Request. *Id.* at 35-37.

9

In addition to running this new search and also in response to the Court's November 2019 Order, RIDS rechecked all the searches previously made and information previously gathered. *Id.* at 57. But although Mr. Hardy acknowledged that RIDS could do a full text search across the now fully-digitized OVB file for "spinoff," "parallel," "follow-up," or "continuation," it did not, both because FOIA does not require RIDS to conduct research, and because any investigation opened after OVB was closed would not have been referred to in the OVB file in any case, since closed investigation files include only information that was available while the investigation was open. *Id.* at 69-70. Mr. Hardy testified that RIDS also did not consider whether any new investigations into the hundreds of individuals and organizations that were the subject of OVB had subsequently been opened in responding to the Court's November 2019 Order, but that it did conduct a full text search across the now-digitized OVB for the names of the individuals for whom Plaintiff submitted Privacy Waivers, and would do so with respect to the Salah file, too. *Id.* at 64-66.

In turn, Agent William testified that his role in responding to FOIA requests— including the one at issue here—is limited to addressing whether the request interferes with pending or active investigations, and that he does not search for responsive documents or determine whether a request reasonably describes the records sought. *Id.* at 73-75. Agent William indicated that in this case he also was asked whether OVB was a closed investigation, which he helped answer by reviewing certain records from the file. *Id.* at 76-77. Agent William testified further that the

name of the OVB investigation had changed over time as it grew to encompass other subjects, but the case number did not; OVB was closed because the statute of limitations had run on any possible charges; and OVB was never reopened or continued under a different case name or number. *Id.* at 78-80.

Agent William also reviewed the opening and closing dates of the Salah investigation, which he testified began in March 2002 and concerned potential "bank fraud to finance either foreign or domestic terrorist groups." *Id.* at 81. Agent William explained that although Mr. Salah was a subject in both OVB and the 2002 Salah investigations, the investigations concerned different underlying conduct; that is, OVB concerned individuals and entities that funneled money to Hamas, while the Salah investigation commenced as part of an enterprise-wide response to the events on September 11, 2001, and examined criminal fraud perpetrated to fund a "domestic or terrorist group." In other words, the Salah investigation was predicated on a different set of allegations based on new information. *Id.* at 82-85, 97. Additionally, Agent William stated that he likely would be aware of any spinoff investigations from OVB given his tenure with the Chicago field office, but could not "say for certain" whether there were any other than the Parallel Investigation. *Id.* at 104. Consistent with Mr. Hardy's testimony, Agent William stated that he had not examined whether any OVB subjects were the focus of more recent investigations. *Id.* at 103.

Following the hearing and at the parties' request, the Court ordered supplemental briefing on the 2019 show cause motion, and denied Defendants'

summary judgment motion with leave to supplement and refile pending the outcome of the 2019 show cause motion and in light of the ongoing production. R. 130; 131.

In the midst of the supplemental briefing on the 2019 show cause motion, which was delayed due to COVID-19, Plaintiff sought clarification of the Court's September 2017 Order, and so on July 8, 2020 filed a second show cause motion concerning whether Defendants should be held in contempt for failure to process and produce documents responsive to Sections Two and Three of the FOIA Request at the rate of 3,500 per month, and continue to provide monthly status reports ("2020 show cause motion"). R. 144. In all, the 2020 show cause motion asks the Court to: (1) require the Government to resume its submission of monthly status reports; (2) increase the processing of documents responsive to the FOIA Request to 5,000 pages per month; and (3) require Defendants to pay the costs and fees associated with the motion. Because both show cause motions concern Defendants' compliance (or failure to comply) with the Court's September 2017 and 2019 orders, and more particularly the extent of Defendants' obligations to search for and process documents responsive to Sections Two and Three of the FOIA Request, the Court addresses them together here.

**Standard**

A party may be held in contempt of a judicial order when: "(1) the Order sets forth an unambiguous command; (2) [the party] violated that command; (3) [the party's] violation was significant, meaning it did not substantially comply with the Order; and (4) [the party] failed to take steps to reasonabl[y] and diligently comply

with the Order." *Prima Tek II, LLC v. Klerk's Plastic Indus., B. V.,* 525 F.3d 533, 542 (7th Cir. 2008) (internal citations omitted). The party moving for an order of contempt bears the burden of establishing by clear and convincing evidence that this test is satisfied. *Lewitton v. ITA Software, Inc.*, 2010 WL 4930851, at *4 (N.D. Ill. Nov. 30, 2010).

## Analysis

### I.    2019 Show Cause Motion

Plaintiff argues that the Court should hold Defendants in contempt for failure to adequately search for documents responsive to Sections Two and Three of the FOIA Request, and for failure to produce them at the 3,500 pages per month rate set forth in the Court's September 2017 Order. But a review of that order and the motion hearing transcript from that same date shows that the Court's directive applied only to the 33,120 pages that Defendants had already identified and begun to process; in short, the OVB file. Indeed, the Court specifically indicated that to the extent Plaintiff sought to challenge the search that identified those 33,120 pages or sought review of documents beyond the pages identified, that issue "should be addressed in the context of a motion for summary judgment, and the expedited processing need not include such documents." R. 40; R. 43 at 8. Accordingly, the September 2017 Order clearly and unambiguously applied only to the processing and production of OVB. The Court declines to hold Defendants in contempt on that basis alone.

But Plaintiff contends that the Court indicated otherwise at the May 2019 status conference, and specifically that the September 2017 Order—including its

requirements regarding the processing rate—extended to all sections of the FOIA Request. Plaintiff points in particular to the Court's statement that it "ordered all files related to the intelligence investigation associated with Operation Vulgar Betrayal and all files related to the investigation that continued the work of the 265-CG-101942 file in the 2000s," and the discussion that followed regarding the existence of such a later investigation. R. 78 at 21-22. The parties debate the legal effect of the Court's oral remarks at the May 2019 status conference. But regardless, the Court acknowledges that those remarks were confusing in that the September 2017 Order was not so broad. Accordingly, it cannot conclude that the May 2019 Order set forth an "unambiguous command" that would support an order of contempt. So the Court will not hold Defendants in contempt for their failure to process and produce records responsive to Sections Two and Three on this basis, either.

But the inquiry does not end there. Plaintiff also complains that the declarations Defendants submitted in response to the Court's orders were inadequate, insofar as they did not clearly address whether there was any continuation of the work of OVB after that investigation was closed. Plaintiff is technically correct. But those declarations and the show cause hearing testimony reflect that not only did the FBI adhere to its general policies in responding to the FOIA Request, but also it went beyond those policies in order to more carefully address the Court's (and Plaintiff's) concerns. Indeed and as discussed, in addition to looking for administrative links between OVB and other investigations, the FBI used information received from Plaintiff subsequent to the FOIA Request (that is, the

14

News Articles and Salah Indictment appended to her opposition to Defendants' summary judgment motion) to locate and immediately begin processing the Salah file, despite concluding: (1) that the material located was not responsive to the four corners of Sections Two and Three; and (2) that those sections were inherently vague.

Defendants' work in this regard is ongoing. But Plaintiff persists that Defendants should do more, including search for, among other things, documents related to the entities and other individuals referenced in the News Articles she attached to her opposition to Defendants' motion for summary judgment, and/or the names of the subjects in the OVB investigation.[4] But doing so would require Defendants to look into literally dozens of individuals and entities, despite that numerous courts have held that requests akin to Sections Two and Three are overbroad. *See, e.g.*, *Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (request for "'all' records that 'relate to' each subject area" was "overbroad since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote fashion") (citation omitted); *see also Cable News Network, Inc.*

---

[4] More specifically, Plaintiff's supplemental brief to her 2019 show cause motion requests (among other things) that the Court direct Defendants to "[r]un a full-text search" for the names of 50 individuals and entities she gleaned from Defendants' production were significant subjects of OBV "within CRS, determine whether any resulting files share 'common subject matter' with OVB such that they are responsive to Plaintiff's FOIA request, and produce any responsive files." R. 132 at 14 & Ex. E. Plaintiff also asks the Court to direct Defendants to produce the case names and file numbers for all new investigations opened into OVB targets following September 11, 2001. *Id.* at 14. And she complains that Defendants failed to explain why RIDS did not search for "individuals and entities," besides Messers. Marzook, Salah, and Ashqar, "who were named as investigatory targets in the [News Articles] with equal or greater frequency." *Id.* at 8-9.

*v. Fed. Bureau of Investigation*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) (request for records that "relate in any way" to certain memos was too vague to trigger obligation to search); *White v. Exec. Office of United States Attorneys*, 444 F. Supp. 3d 930, 936 (S.D. Ill. 2020) ("A request seeking all records relating to a subject may not" reasonably describe the records sought "and therefore may not trigger the agency's obligation to search for records."). Indeed, "duties that FOIA imposes on agencies . . . apply only once an agency has received a proper FOIA request." *Citizens for Responsibility and Ethics in Wash. v. FEC*, 711 F.3d 180, 185 n. 3 (D.C. Cir. 2013). As such, because Defendants will have processed upwards of 74,000 documents between the OVB and Salah files despite the fact that Plaintiff's FOIA Request was overbroad and vague, the Court will not require Defendants to search for documents related to the entities and other individuals referenced in the News Articles and/or OVB files, or to otherwise engage in a search for records that might some way "relate to" OVB. *See Schrecker v. United States Dep't of Justice*, 349 F.3d 657, 664 (D.C. Cir. 2003) (requiring the Government to research names of third parties appearing in responsive documents would be unduly burdensome); *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 891-92 (D.C. Cir. 1995) (an agency is not required to undertake a search that is so broad as to be unduly burdensome). Further, while the Court will not permit Plaintiff to use information gleaned from records she has or will receive in this case to multiply Defendants' obligations to respond to her initial request, nothing prevents Plaintiff from preparing additional FOIA requests based on that information (or otherwise).

Nevertheless, the Court is sympathetic to Plaintiff's position as a private citizen without the knowledge required to prepare a FOIA request capable of yielding a satisfactory response on her first attempt. And the Court acknowledges that FOIA was designed to provide citizens like her with certain information they otherwise lack. The Court also questions the FBI's decision not to notify Plaintiff in the first instance of its position that Sections Two and Three did not reasonably describe records for purposes of any search. *See* 28 C.F.R. § 16.3(b) (if an agency "determines that [a] request does not reasonably describe records, it shall tell [the requester] . . . so that [the requester] . . . may modify it to meet the requirements of [FOIA]"). If it had, Plaintiff may have received non-exempt portions of the Salah file sooner. Accordingly, notwithstanding that the September 2017 Order did not unambiguously require Defendants to provide them (let alone at an accelerated rate), and taking into account Plaintiff's representation that she has begun work on a second documentary concerning FBI surveillance, the Court directs Defendants to process the remainder of the approximately 41,250 pages that make up the Salah file at a rate of 1,000 pages per month, beginning with the October 2020 production in this matter. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II) (allowing expedited processing when a "person primarily engaged in disseminating information" demonstrates that there exists an "urgency to inform the public concerning the actual or alleged Federal Government activity."). While not the 5,000 pages per month rate Plaintiff requests, this rate balances the need for transparency in government with the allocation of the FBI's limited resources, which

as Defendants describe[5] and Plaintiff acknowledges, are stretched particularly thin as a result of the COVID-19 pandemic, R. 152. This ruling is without prejudice to Plaintiff's re-raising the processing rate should circumstances surrounding the pandemic and/or RIDS's staffing change.

Plaintiff also raised the fact that Defendants apparently did not search the FBI's electronic surveillance database, ELSUR, for responsive files. Plaintiff is particularly concerned that ELSUR may house information as to the individuals for whom she submitted Privacy Waivers.[6] Defendants failed to respond to Plaintiff's arguments. An "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby v. United States Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990). "At the very least," the agency must "explain in its affidavit that no other record system was likely to produce responsive documents." *Id.* Defendants have not done so. Accordingly, Defendants are hereby ordered to search ELSUR for the names of the individuals for whom Plaintiff has submitted Privacy Waivers, and process any such documents that search turns up to the extent they were created during and as part of the OVB or Salah investigation. Defendants shall also search for and process any other documents created during and as part of the OVB and Salah investigations to the extent not already processed via

---

[5] Indeed, according to Defendants, RIDS's work cannot be conducted remotely, and RIDS is operating at only a third of its typical staffing because of COVID-19 and associated social distancing concerns.

[6] The Court understands that Plaintiff is otherwise satisfied with Defendants' search for documents related to the individuals for whom she submitted Privacy Waivers. *See* R. 142 at 5.

its review of CRS. The expedited processing ordered above shall apply to any such ELSUR records.[7]

Notwithstanding, the Court declines to hold Defendants in contempt for their efforts, because Plaintiff has not shown that any violation of the Court's orders was "significant," or that Defendants "failed to take steps to reasonabl[y] and diligently comply" with those orders, insofar as Sections Two and Three are overbroad and Defendants have nevertheless begun to process documents in good faith based on the clarification Plaintiff recently provided.[8]

## II.    2020 Show Cause Motion

As discussed, the 2020 show cause motion also concerns Defendants' alleged failure to abide by the Court's September 2017 and 2019 orders. Specifically, the 2020 motion concerns Defendants' alleged failure to provide joint monthly status updates to the Court on its processing and production of documents, and process documents responsive to Sections Two and Three of the FOIA Request at the rate ordered by the

---

[7] Plaintiff also requests that Defendants broadly search Sentinel, the FBI's newer electronic case management system that allows for full-text searches. But according to Mr. Hardy, RIDS already searched Sentinel during the administrative stage of the FOIA Request for "Vulgar Betrayal" and "265-CG-101942," R. 80, Ex. 2 ¶ 22, and because the OVB and Salah investigations were both closed before 2012, when Sentinel was implemented, a search for documents in either file would be fruitless. Further, RIDS also conducted a page-by-page review of OVB to locate any investigations that, like the Parallel Investigation, were administratively linked thereto. And for the reasons already explained, the Court declines to order any broader search.

[8] For the same reasons, and despite Plaintiff's urging otherwise, the Court declines to order additional inquiries to FBI case agents previously assigned to OVB regarding any continuation of the work of OVB and/or additional searches for files in CRS or otherwise that share "common subject matter" with OVB. *See* R. 132 at 13-14. Agent Williams's testimony was adequate as to this subject.

Court in September 2017 and reaffirmed by it in May 2019. R. 145. Defendants contend that this motion is duplicative of the 2019 show cause motion, R. 149, and the Court agrees. Plaintiff argues that the motions are different because the 2019 motion concerns the Government's failure to adequately search for records in response to the FOIA Request as required by the Court's orders, whereas the 2020 motion concerns the rate of production after that search is complete. But the two subjects are inextricably intertwined, and Plaintiff sought expedited processing in both motions. *See* R. 132 (supplemental brief on 2019 show cause motion requesting expedited processing at 5,000 pages per month). The Court addressed the processing rate as part of its resolution of that motion, so need not do so again here. And because the Court has already concluded that the September 2017 Order did not unambiguously apply to Sections Two and Three of the FOIA Request, nor will the Court fault Defendants for failure to submit monthly status reports concerning the Salah file to date. Accordingly, Plaintiff's 2020 show cause motion is denied. But because such monthly status reports will serve to keep the Court apprised of Defendants' progress in that regard, and because Defendants do not object to providing them, the Court directs Defendants to do so beginning with its next production.

## Conclusion

In sum, beginning with the October 2020 production: (1) Defendants shall process the remaining Salah files and any documents housed in ELSUR as ordered above at a rate of 1,000 per month, without prejudice to Plaintiff requesting that the

Court revisit that rate at such time as the pandemic abates or circumstances surrounding RIDS's staffing or capabilities change; and (2) the parties are to submit joint monthly written status reports concerning Defendants' compliance with this order. But for the reasons stated, Plaintiff's 2019 and 2020 motions to show cause, R. 99 and R. 144, are otherwise denied.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: September 23, 2020